Filed 11/9/22  P. v. Martinez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIA PONCE MARTINEZ,<br><br>    Defendant and Appellant. | F082203<br><br>(Super. Ct. No. BF181599A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Matthew J. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

During a dispute that began with a racial epithet against her neighbor, defendant Maria Ponce Martinez entered her neighbors' apartment; engaged in a physical altercation with the two adults; and, after returning with a baseball bat, threatened to "get" their nine-year-old child next and damaged their door and multiple windows with the bat. Defendant was charged by information with the six felonies and one misdemeanor, as follows: one count of assault with a deadly weapon against S.D. (Pen. Code, § 245, subd. (a)(1); count 1),[1] one count of assault with a deadly weapon against J.M. (§ 245, subd. (a)(1); count 2), child endangerment against L.M. (§ 273a, subd. (a); count 3), making criminal threats against L.M. (§ 422, subd. (a); count 4), first degree burglary (§ 460, subd. (a); count 5), vandalism (§ 594, subd. (b)(1); count 6), and misdemeanor resisting arrest (§ 148, subd. (a)(1); count 7).[2]

During trial, the vandalism count was reduced from a felony to a misdemeanor. The jury subsequently acquitted defendant of burglary, but convicted her of the lesser included offenses of assault on counts 1 and 2, child endangerment, making criminal threats, vandalism, and resisting arrest. The trial court sentenced defendant to the middle term of four years for child endangerment, but suspended execution of sentence and placed her on probation for four years, with one year in jail. The court imposed the middle term of two years, stayed under section 654, for making criminal threats, 180 days in jail with credit for time served for the assault counts, and concurrent terms of one year in jail for vandalism and resisting arrest.

Defendant advances one claim on appeal. She seeks reduction of her conviction for child endangerment from a felony to a misdemeanor on the ground that there is insufficient evidence supporting the jury's finding that she inflicted mental suffering on

---

[1]    All further statutory references are to the Penal Code.

[2]    An eighth charge of felony vandalism was dismissed following the preliminary hearing.

2.

L.M. under "circumstances or conditions likely to produce great bodily harm or death …." (§ 273a, subd. (a).) The People dispute any entitlement to relief.

We find substantial evidence supports the jury's verdict on count 3 and affirm the judgment.

### FACTUAL SUMMARY

S.D.; her partner, J.M.; their 9-year-old daughter, L.M.; and their 15-year-old son lived in the same apartment complex as defendant, in an adjacent apartment. S.D. testified that she and defendant had been on friendly terms but shortly before the crimes, defendant started calling her the N-word. Although it angered S.D. and she felt defendant was racist given the repeated use of the term, she just responded by smiling and laughing.

In June 2020 at around 9:00 a.m., S.D. and J.M. awoke to the sound of their small dog barking in the yard, sounding stressed. S.D. got up, moved the blinds aside in the dining area of the apartment, and saw defendant standing right outside against the window. S.D. asked defendant to move away because her presence was making the dog bark. Defendant responded by saying, "fuck you, [N]," and holding up her middle finger.

After putting some clothing on, S.D. opened the front door. She testified that defendant was standing at the door with a basketball and water in hand, while J.M. testified the two argued outside angrily before moving to the front door. As defendant stood at the open front door, she had a wood or metal broom handle in her hand, which S.D. kept outside for yard work.[3] J.M., who had an issue with his legs and used a walker, positioned himself in the doorway between defendant standing on the outside and S.D. standing on the inside. Defendant hit J.M. with the broom handle while trying to get at

---

[3]  Descriptions of the handle were inconsistent, but all three witnesses testified that defendant had it in her hand when she was in the doorway of the apartment. S.D. described the item as a pole and then clarified it was a wooden broom handle. J.M. said it was an aluminum broom handle, and L.M. said it was big, black and metal. A responding officer testified that he found a bent hollow metal white or grey broom handle in the bushes outside.

S.D.  Defendant then dropped the items, pushed J.M. down with her hands, and charged at S.D.  Defendant ended up on top of S.D., pinning her to the floor as L.M. stood nearby watching.  J.M. was still on the floor unable to get up and defendant outweighed S.D., so she called for L.M. to help get defendant off of her.

L.M. picked up "a stick" and hit defendant in the head several times while yelling, "get off my mama[!]"  This caused defendant to look up and S.D. kicked her in the face.  Defendant then got up, grabbed her phone from the floor where it had fallen, and left.  S.D. went into the bathroom to run water over her bleeding hand and call 911.

Defendant returned right away with a baseball bat, and she started pounding on the closed screen door with the bat and demanding that J.M. open it.  Defendant started breaking windows with the bat and yelling at L.M., "I'm gonna get you too, you little bitch."  J.M. asked if defendant was threatening his daughter and defendant said, "F you too.  And, yeah, I'm threatening her."

Defendant then ran off, but was quickly located one street over from the apartment complex by an officer on foot.  Defendant was sitting on the curb still holding the baseball bat.  Her speech was "incomprehensible," and she kept turning around while the officer searched her, despite being told to face forward.  Defendant was also yelling during the search, spraying spittle as she did.  Defendant kept saying she had been stabbed with a knife, but the officer observed no injuries on her.  After the officer managed to get defendant handcuffed, defendant kept moving and disobeying directions.  Once a patrol car arrived, it took four officers to get defendant inside.  She refused to get in; she kept straightening her arms, legs and body; and she used her body weight to resist.

J.M. testified that although defendant hit him with the handle and pushed him down, he was not injured.  S.D. sustained gashes to her thumb and pinky, and she said she had permanent numbness where she was cut.  It was unclear exactly how she was injured.  There was some testimony that defendant may have had a knife.  S.D. testified that defendant must have pulled a pocketknife out while they were on the floor and cut

4.

her with it, because defendant was digging around her pockets and the cuts were too deep to be scratches. The officer who interviewed S.D. that morning testified she told him defendant was swinging a knife, a pole, and her fists. J.M. and L.M. did not see a knife, however, and police did not locate a knife at the scene, on defendant, or in the backpack she had when arrested, although her apartment was not searched.

There was blood on the porch, front door, and wall. L.M. said there was blood on the handle when she picked it up to hit defendant, and an officer testified the metal broom handle he found was jagged where it was bent. He also testified that there were five broken windowpanes and damage to the screen door.

## DISCUSSION

### I. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the

5.

defendant's guilt .…'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

## II.      Analysis

### A.      Felony Child Endangerment

Defendant was convicted of felony child endangerment under section 273a, subdivision (a), which "'is an omnibus statute that proscribes essentially four branches of conduct.'" (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*), quoting *People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*).) The statute provides, "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (§ 273a, subd. (a).)

"Violation of section 273a, subdivision (a) '"can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." (*People v. Smith* (1984) 35 Cal.3d 798, 806.) … Section 273a[, subdivision (a)] is "intended to protect a child from an abusive situation in which the probability of serious injury is great." (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835.) "[T]here is no requirement that the

actual result be great bodily injury." (*Ibid.*)' (*Sargent, supra*, 19 Cal.4th at pp. 1215–1216.)" (*Valdez, supra*, 27 Cal.4th at p. 784.)

### B. Substantial Evidence Supports Conviction

Defendant does not dispute that there is sufficient evidence she inflicted unjustifiable mental suffering on L.M., but she argues the evidence is insufficient to show "circumstances or conditions likely to produce great bodily harm or death" and, therefore, her conviction should be reduced from felony to misdemeanor child endangerment. (§ 273a, subd. (a).) We disagree.

The evidence, viewed in the light most favorable to the prosecution, shows that defendant became enraged after S.D. asked her to move away from the side of the family's apartment because her presence was making their dog bark. Defendant began spewing racial epithets and was at the family's open apartment door with a metal handle in hand. While attempting to strike S.D. with the handle, she struck J.M. and then pushed him down. Defendant barged inside and S.D. ended up on the floor pinned down by defendant, who outweighed her. Because J.M. was unable to get up quickly without assistance, he could not come to S.D.'s aid and she had to call for L.M., who was witnessing the assault on her parents. L.M. grabbed a stick or a handle and struck defendant several times while yelling for defendant to get off of her mother. This enabled S.D. to kick defendant in the face.

Although defendant got up and left, she immediately returned with a baseball bat, started pounding on the family's screen door with it and demanding they open it. J.M. described defendant as "going ballistic." Defendant began breaking the apartment windows with the bat. During this time, she called L.M. "a little [bitch]," and said, "I'm gonna get you too, you little bitch," which L.M. interpreted to mean defendant was going to kill her. J.M. asked defendant if she was threatening his daughter and responded, "F you too. And, yeah, I'm threatening her." When defendant was located by police shortly thereafter one street over, she still had the baseball bat with her.

7.

J.M. described L.M. as "hysterical" and "scared" by defendant's actions, and he stated she was still frightened of defendant. L.M. testified she started crying, she asked defendant to leave them alone, and she did not understand why defendant helped her build something the previous day and "turn[ed] evil" the next day. L.M. said she feared defendant was going to kill her and she was still frightened of defendant at the time of trial, approximately four months after the incident.

Defendant did not physically injure L.M. or attempt to physically injure her, but "[f]elony child abuse does not require *force* likely to produce great bodily injury" (*People v. Clark* (2011) 201 Cal.App.4th 235, 243, italics added), and it does not require ""that the actual result be great bodily injury""" (*Valdez, supra*, 27 Cal.4th at p. 784). The statute is intended "to protect vulnerable members of society from a wide range of dangerous situations" (*id.* at p. 790), and "[w]hether the injury is inflicted under circumstances or conditions likely to produce great bodily injury is a question for the trier of fact" (*People v. Clark, supra*, at p. 245, citing *Sargent, supra*, 19 Cal.4th at p. 1224).

The felony child endangerment charge was based on the incident in its entirety, and the jury was entitled to consider the totality of the circumstances. (*People v. Clark, supra*, 201 Cal.App.4th at p. 245.) As stated, L.M. was only nine years old and defendant, an adult larger than her mother, struck her father with a metal handle, knocked him to the ground, and charged inside, knocking her mother to the ground. L.M. had to physically intervene and hit defendant with an object to stop the assault on her mother, and, after leaving, defendant returned immediately armed with a baseball bat, which she used to pound on the screen door and smash windows, demanding to be let in. During the midst of this, defendant was calling L.M. a little bitch and threatening to get her next. Defendant was enraged throughout this incident, and, following her arrest, it took multiple officers to get her into a patrol car.

From the totality of this evidence, a reasonable jury could infer that in inflicting mental suffering on L.M., there existed "circumstances or conditions likely to produce

8.

great bodily harm" (§ 273a, subd. (a); accord, *Sargent, supra*, 19 Cal.4th at p. 1221; *People v. Lee* (1991) 234 Cal.App.3d 1214, 1220 ["Section 273a does not focus upon actual injury produced by abusive actions but 'rather upon whether or not the attendant circumstances make great bodily injury likely.'"].)  It is immaterial that defendant did not actually harm L.M. physically with the metal handle, her fists, or the baseball bat. Substantial evidence supports defendant's conviction for felony child endangerment, and we affirm the judgment.

## DISPOSITION

The judgment is affirmed.


                                                                    MEEHAN, J.
WE CONCUR:


PEÑA, Acting P. J.


SNAUFFER, J.